J-S84018-16

2017 PA Super 99

| | |
|---|---|
| GEORGE E. MICHAEL | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| JUDITH STOCK | |
| JUDITH STOCK | |
| v. | |
| COMMONWEALTH LAND TITLE INSURANCE COMPANY AND EDWARD J. MORRIS, ESQUIRE | |
| GEORGE E. MICHAEL | |
| v. | |
| TOHICKON ABSTRACT COMPANY | |
| APPEAL OF: JUDITH STOCK | |
| | No. 1229 EDA 2016 |

Appeal from the Order Entered April 17, 2013
In the Court of Common Pleas of Bucks County
Civil Division at No(s): 2007-10687-19-1

BEFORE:  OLSON, J., SOLANO, J., and FITZGERALD, J.[*]

OPINION BY SOLANO, J.:                              **FILED APRIL 11, 2017**

Appellant Judith Stock appeals from the order denying her motion for

partial summary judgment and granting a cross-motion for summary

judgment by Appellee Commonwealth Land Title Insurance Company ("Land

---

[*] Former Justice specially assigned to the Superior Court.

Title"). For the reasons that follow, we vacate the trial court's order and remand for further proceedings.

This case arose out of a failed real estate transaction. Stock attempted to sell to George Michael property in the Borough of Bristol, Bucks County, that was comprised of two lots (A and B). Stock and Michael initially believed that Stock held title to both lots, but, in fact, she did not hold title to Lot B. When Michael discovered the title problem, he withdrew from the transaction and sued Stock, seeking compensation for money he spent in reliance on the contract of sale. Stock then filed a third-party complaint against Land Title, which had issued her a title insurance policy and provided other services when she purportedly purchased Lots A and B. Stock and Land Title filed cross-motions for summary judgment. Stock now appeals the trial court's order denying her motion and granting that of Land Title.

The property at issue is located at 4 Mill Street in Bristol, and is currently identified for tax purposes as Bucks County Tax Map Parcel Number 4-18-28. Trial Ct. Op., 4/22/13, at 1.[1] The trial court explained:

> [T]he subject property is comprised of two parcels. The first parcel ("Lot A") contains a three-story building and a free-standing, one-story garage. The three-story building has been operated as a hotel and restaurant. The title of Lot A is marketable. Daniel T. Pezzola, Jr., Alfred T. and Elaine G.

---

[1] The trial court issued an opinion on April 22, 2013, explaining its rulings on several motions for summary judgment, including the two at issue in this appeal. On May 25, 2016, the trial court issued another opinion, in response to Stock's Pa.R.A.P. 1925(b) statement.

Pezzola, and Daniel D. and Janet Pezzola (collectively "Pezzolas") held title to Lot A until they conveyed it to Stock in 1999.

The history of the second lot ("Lot B") is as follows: The Borough of Bristol transferred Lot B, in fee, to the Pezzolas by deed dated May 9, 1994. Lot B was a portion of the larger Tax Map Parcel Number 4-18-29 that the Borough of Bristol owned. The transaction severed Lot B from Parcel Number 4-18-29. On January 23, 1995, the Bucks County Board of Assessment updated its tax map parcel records to reflect that Lot B merged with Lot A, and both collectively became known as Bucks County Tax Map Parcel Number 4-18-28. However, the metes and bounds descriptions contained in the deeds to Lot A and B were not updated to reflect this merger. Lot B is unimproved.[2]

*Id.* at 2-3. Thus, as of 1999, the Pezzolas owned both Lots A and B. They had acquired Lot A through a series of transfers, the last of which were recorded in deeds dated 1991 and 1998. They acquired Lot B in 1994, but the deeds for the two properties were not formally merged at that time. Trial Ct. Op., 5/25/16, at 10.

On February 26, 1999, the Pezzolas entered into an Agreement to sell to Stock "the hotel liquor business located on 4 Mill Street, Borough of Bristol, Bucks County, Pennsylvania . . . ." Second Am. Third-Party Compl., Ex. A ¶ 1.[3] The Agreement provided, "[s]eller further agrees to sell and the

_____

[2] Although Lot B is substantially unimproved, the parties agree that a small portion of a concrete deck and sidewalk servicing the hotel and restaurant is located on that parcel. **See** Appellee's Brief at 5.

[3] The Agreement recited that the sellers (under the name "DDA, Inc.") operated a business (referenced in the Agreement as the "hotel liquor business") at 4 Mill Street that held a hotel liquor license and was called "Bristol House." It also recited that the real estate at 4 Mill Street was held by the Pezzolas and said that Stock and her husband (now deceased)

*(Footnote Continued Next Page)*

Buyer agrees to purchase all real estate located and connected to the aforesaid property . . . ." *Id* ¶ 3.[4] The Pezzolas agreed to convey title to the property that was "good and marketable and such as will be insured at regular rates by any title company recognized in the Commonwealth of Pennsylvania." *Id.* ¶ 14. Stock agreed to "immediately, upon execution of this Agreement, order the necessary title insurance search" and to "pay for the title insurance, title search and title certificate." *Id.* ¶ 18.

Stock alleges that she then entered into a contract under which Land Title agreed to provide "real estate transactional services" — including title searches and the drafting and filing of a deed — for her purchase of the property, and to issue a policy insuring title to the property. Second Am. Third-Party Joinder and Compl. ¶¶ 5-6, 8, 53. On May 3, 1999, Stock obtained a Title Insurance Commitment from Land Title. Trial Ct. Op., 4/22/13, at 3. The Commitment stated:

> SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, COMMONWEALTH LAND TITLE INSURANCE COMPANY . . . insures, as of Date of Policy shown in Schedule A, against loss or damage, not

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯

desired to buy the business, "together with the real estate situate at 4 Mill Street." Agreement, pp. 1-2.

[4] The contract stated that the real estate was "more particularly described in Exhibit 'B' attached hereto and made a part hereof." This Exhibit B is not in the record, and it appears that no party has been able to locate it. As discussed in the text, however, both Stock and the Pezzolas agree that the intent of the 1999 transaction was to convey both Lots A and B.

exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;

2. Any defect in or lien or encumbrance on the title;

3. Unmarketability of the title;

4. Lack of a right of access to and from the land.

*Id.* at 12.

Schedule A of the Commitment provided, in relevant part:

The land referred to in this Commitment is described below and in Schedule C attached hereto and made a part hereof.

Note For Information Only:
The land referred to in this Commitment is commonly known as:

4 Mill Street
Bristol Borough
Bucks County, Pennsylvania.

Trial Ct. Op., 4/22/13, at 12, quoting Title Insurance Commitment, Sched.

A. Schedule C contained the following description:

ALL THAT certain messuage, restaurant, Hotel Property, Store and other buildings, and Lot of land, situate in the First Ward of the Borough of Bristol, in the County of Bucks and State of Pennsylvania, bounded and described according to a survey thereon made by John P. Taylor C.E., on February 15, 1928 as follows, to wit:

BEGINNING at a point in the Southwest side of Mill Street, at a corner of land now or late of Lewis J. Bevan, thence along the said side of Mill Street, South 52 degrees 35 minutes East 96.60 feet to an angle, thence still along the same, South 40 degrees 19 minutes 35 seconds East 27.83 feet more or less to a stone set for a corner in land now or late of the Delaware Division Canal Company of late the Canal Basin, thence following the line of what was formerly the line of the said Canal Basin and now

land of the said Canal Company in a circular direction the following courses and distances: South 53 degrees 02 minutes West 31.60 feet to an angle, thence South 54 degrees West 34.40 feet to an angle; thence South 66 degrees 59 minutes West 132.00 feet to a corner in the said Canal Basin, thence along the Canal Basin, North 46 degrees 16 minutes West 43.10 feet to a corner in land now or late of Lewis J. Bevan, thence along same North 37 degrees 59 minutes East 180.40 feet to the place of beginning.

BEING LOT NUMBER 4 on said Plan[5]

COUNTY PARCEL NUMBER 4-18-28.

Title Insurance Commitment, Sched. C. It is undisputed that the metes and bounds set forth in Schedule C describe only Lot A. Trial Ct. Op., 4/22/13, at 3. In fact, the description of the property in the Commitment, including the metes and bounds and the lot number and County Parcel Number references, is the same as that in a 1991 deed by which the Pezzolas obtained title to the property at 4 Mill Street — at a time when that property did not yet include Lot B.[6] Stock claims that when she received that description in Schedule C, she did not know that it encompassed only Lot A.

On June 21, 1999, Stock received a deed conveying the property from the Pezzolas to Stock. Stock alleges that Land Title was responsible or

_____

[5] Neither the parties nor the trial court address the reference to "said Plan" or direct us to the location of this plan in the record, and we have been unable to determine with confidence whether the plan is in the record.

[6] The 1991 deed (9/19/91 deed from Bethels to Pezzolas) refers to "Bucks County Uniform Parcel Identifier: Tax Parcel Number 4-18-28," while the Commitment refers to "County Parcel Number 4-18-28." There is no substantive difference between the two descriptions.

shared responsibility for preparing that deed. Second Am. Third-Party Compl. ¶ 8. The deed contained the same metes and bounds description, lot number, and parcel number as that in the Title Insurance Commitment. Trial Ct. Op., 4/22/13, at 3; Plaintiff's Compl. Ex. C (1999 deed). Stock claims that she did not know that this description included only Lot A.

After the closing of the transaction between Stock and the Pezzolas, Land Title issued a Title Policy to Stock. The Policy[7] insures against "[t]itle to the estate or interest described in Schedule A being vested other than as stated therein." Owner's Policy of Title Insurance, p. 1. Schedule A to the Policy is a description of the property that is identical to Schedule C of the Title Commitment, and, like the Commitment, it covers "ALL THAT certain messuage, restaurant, Hotel Property, Store and other buildings, and Lot of land" described by a metes and bounds recitation that encompasses only Lot A. With some circularity, the policy defines the term "land" as —

> the land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A . . . .

_____

[7] The parties agree that a Title Policy was issued, but they have been able to locate only the schedules to that policy. Appellant's Brief at 6-7; Appellee's Brief at 6. For purposes of this litigation, Land Title provided an exemplar of the Title Policy, including the "policy jacket" and schedules it claims were actually issued to Stock. Appellee's Brief at 6. Both Stock and Land Title rely upon the definition of "land" in the policy exemplar provided by Land Title. Appellant's Brief at 13; Appellee's Brief at 19. We accept the parties' joint reliance on this provision as a stipulation that the policy contained that definition.

Trial Ct. Op., 4/22/13, at 13 (quoting policy). Schedule B to the policy lists exceptions to coverage, including a "survey exception" that applies to "[u]nrecorded easements, discrepancies or conflicts in boundary lines, shortages in area and encroachments which an accurate and complete survey would disclose." Appellant's Brief at 22; Appellee's Brief at 34 (quoting policy).

On August 1, 2006, Stock and Michael entered into an agreement whereby Stock would sell to Michael "all that certain tract or parcel of land, including any buildings and other improvements located thereon, being Tax map Parcel No. 4-18-028," for $2.2 million. Agreement of Sale ¶¶ 1-2. At that time, Stock and Michael believed that both Lots A and B were included in the property to be conveyed. Michael paid Stock $120,000 in deposits and incurred additional expenses to obtain approvals for his planned development of the property. Trial Ct. Op., 4/22/13, at 3-4.

Prior to the closing, on March 27, 2007, Michael advised Stock that the 1999 deed had not transferred Lot B to Stock. Stock contacted Land Title, and a Land Title employee suggested that Stock cure the defect in title through a Deed of Confirmation. However, on June 8, 2007, Michael informed Stock that the Deed of Confirmation would not cure the defect. On September 17, 2007, Stock provided Land Title with a written notice of a claim under the Title Insurance Policy. On September 25, 2007, Michael withdrew from the sale due to the lack of clear title. On October 5, 2007,

Land Title denied Stock's insurance claim. Trial Ct. Op., 4/22/13, at 4. In February 2008, the Pezzolas executed a Deed of Confirmation that stated that their 1999 deed was intended to convey both Lots A and B to Stock. *Id.*[8]

On December 20, 2007, Michael sued Stock, seeking the return of his $120,000 deposit and repayment of expenses he incurred in reliance on the Agreement of Sale. Stock then filed a third-party complaint against Land Title and Edward J. Morris, Esquire, who represented her in the 1999 purchase of the property from the Pezzolas. With respect to Land Title, Stock's pleading (as amended) asserted the following claims: breach of the Insurance Policy and Commitment (Count I); bad faith (Count II); breach of a contract to provide professional services (Count III); negligence (Count IV); and indemnification (Count VII).[9]

On August 6, 2012, Stock filed a motion for partial summary judgment against Land Title, seeking entry of judgment in her favor with respect to Counts I (breach of the Insurance Policy and Commitment) and II (bad

---

[8] After receiving the deed of confirmation, Stock learned of an additional title defect relating to Lot B: a restriction that required the land to be perpetually maintained as a public park. Trial Ct. Op., 4/22/13, at 4. Because Stock's failure to receive any title to Lot B presents a more fundamental title problem than that relating to restrictions on Lot B's use, we limit our discussion in the text to only the failure to convey title.

[9] Stock makes no argument in her appeal regarding Count VII, and any issues relating to that count therefore are waived. Counts V and VI were against Morris and are not at issue in this appeal.

faith). On August 30, 2012, Land Title filed a cross-motion for summary judgment, seeking judgment in its favor with respect to all claims Stock had brought against it.

After a hearing on February 6, 2013, the trial court issued an order dated April 17, 2013, denying Stock's motion and granting that of Land Title.[10] In an opinion dated April 22, 2013, the trial court explained:

> [Land Title] did not breach the Commitment. [Land Title] did not have any obligation to Stock to indemnify or defend her title to Lot B because the Commitment insured only Lot A. . . . Additionally, Stock cannot recover on her claims for negligence and bad faith because [Land Title] had no duty to insure the title to Lot B.

Trial Ct. Op., 4/22/13, at 14.

On April 6, 2016, Stock filed a praecipe to mark her remaining claims against Morris "settled, discontinued and ended."[11] On April 20, 2016, Stock filed a notice of appeal from the April 17, 2013 order.

In this appeal, Stock raises the following twelve issues, as stated in her brief:

> 1. Did the insurance policy issued by Commonwealth Land Title Insurance Company . . . cover Lot B as well as Lot A which lots combined to form County Parcel Number 4-18-28?

---

[10] The trial court also entered summary judgment in favor of Michael and against Stock in the amount of $120,000.

[11] Michael had also filed a Third Party Complaint against Tohickon Abstract Company. On August 8, 2012, Michael filed a praecipe to mark the case against Tohickon as settled, discontinued, and ended. Thus, as of April 6, 2016, when Stock filed her praecipe, there were no outstanding claims.

2. Must the insurance Policy be read as referring to the Bucks County Tax Identifier which is also County Parcel Number 4-18-28?

3. Was the filing of a subdivision plan merging Lot B into County Parcel 4-18-28 sufficient to satisfy the requirements of the Uniform Parcel Identifier Law, 21 P.S. § 331 *et seq.*?

4. Did the definition of public records in the Policy give rise to a duty on the part of [Land Title] to search the public records and discover the subdivision plan merging Lot B into County Parcel Number 4-18-28?

5. Was [Land Title] estopped from denying coverage where the incorrect legal description utilized in the Policy and the Deed resulted from its own failure to properly search the public records?

6. Was Judith Stock ("Stock") entitled to Partial Summary Judgment on the issue of liability under the Policy?

7. Was Lot B excluded by the survey exception in the Policy?

8. Did [Land Title] have a duty to defend the potentially covered claims advanced by Plaintiff, George Michael ("Michael")?

9. Was [Land Title] entitled to Summary Judgment as to Count II of Stock's Second Amended Joinder Complaint alleging bad faith?

10. Was Stock entitled to partial summary judgment as to liability on her bad faith claims against [Land Title]?

11. Was [Land Title] entitled to Summary Judgment as to Count III of Stock's Second Amended Joinder Complaint alleging breach of professional services contract?

12. Was [Land Title] entitled to Summary Judgment as to Count IV of Stock's Second Amended Joinder Complaint alleging negligence?

J-S84018-16

Appellant's Brief at 2-4.[12]

In reviewing an order granting or denying summary judgment, this

Court applies the following principles:

> Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.
>
> Summary judgment is appropriate only when the record clearly shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The reviewing court must view the record in the light most favorable to the nonmoving party and resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Only when the facts are so clear that reasonable minds could not differ can a trial court properly enter summary judgment.

*Shamis v. Moon*, 81 A.3d 962, 968-69 (Pa. Super. 2013) (citation omitted).

In light of these principles, we conclude that the trial court erred in granting

summary judgment to Land Title on all of Stock's claims.

_____

[12] Land Title argues that Stock waived all issues for appeal because her Appellate Rule 1925(b) statement, which raised sixteen issues, was not "concise." Appellee's Brief at 15-17. We decline to find waiver on this basis. *See* Pa.R.A.P. 1925(b)(4)(iv) ("Where non-redundant, non-frivolous issues are set forth in an appropriately concise manner, the number of errors raised will not alone be grounds for finding waiver"); *Boehm v. Riversource Life Ins. Co.*, 117 A.3d 308, 319 n.3 (Pa. Super.) (declining to find waiver where Appellant raised 36 claims in Rule 1925(b) statement, but trial court addressed general issues and case was complex), *appeal denied*, 126 A.3d 1281 (Pa. 2015).

**Counts III and IV (Questions 11 and 12)**

Before addressing Stock's individual issues, we believe it helpful to restate the breadth of Stock's claims. According to Stock's complaint, she entered into an Agreement of Sale to buy the hotel and restaurant at 4 Mill Street from the Pezzolas. The sale included all real estate "situate at 4 Mill Street" and "located and connected to the aforesaid property." Agreement at 1-2. Stock was required under the Agreement to obtain title insurance for the premises, and she alleges she entered into an agreement with Land Title that not only provided for title insurance, but also for such ancillary "real estate transactional services" as title searches and, critically, drafting and filing of the deed to the premises. But Stock claims she did not receive what she bargained for. Instead, the title search failed to disclose that 4 Mill Street consisted of two parcels that had not been merged, the deed that she received gave her title only to Lot A, and the title policy insured her title only to Lot A — meaning that she did not end up owning all of the real estate "situate at 4 Mill Street" and "located and connected to the aforesaid property." Stock claims that Land Title is responsible for these errors.

Stock's claim has its broadest expression in Counts III and IV of her amended third-party complaint, which allege that because she did not receive good and marketable title to Lot B, Land Title breached its contract to provide "real estate transactional services" and was negligent in performing title searches and providing other services that led to the error.

Land Title denies liability under these counts. Although it admits that it acted as "settlement agent" and "prepared and/or assisted in the preparation and dissemination of various papers, agreements and contracts related to the conveyance of the property," it specifically denies drafting the deed. Answer ¶¶ 6, 8. These denials give rise to material issues of disputed fact that preclude summary judgment.

Land Title sought summary judgment on Counts III and IV on the basis of Paragraph 15(b) of the Title Policy that it issued to Stock. Paragraph 15(b) states:

> Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the title to the estate or interest covered hereby or by an action asserting such claim, shall be restricted to this policy.

Owner's Policy of Title Insurance ¶ 15(b).[13] Land Title argued that for purposes of this provision, Stock's claims under Counts III and IV should be treated as arising out of the "status of the title . . . covered" by the Policy that Land Title issued to Stock, and that any recovery on those claims therefore must be pursuant to, and restricted by, the terms of that Policy. But at the same time as it makes this argument, Land Title also contends — indeed, it insists — that because Stock's claim relates to title to Lot B, Stock

---

[13] Because the parties have been unable to locate the full Policy, Land Title relies on Paragraph 15(b) as set forth in the exemplar that it filed with its summary judgment motion. Stock has not claimed that her Policy did not include this provision.

has no viable claim arising "out of the status of the title to the estate or interest covered" by its Policy because, under Schedule A to the Policy, Land Title insured title only to Lot A and the Policy therefore does not cover title to Lot B. If the Policy does not cover the failure to convey good title to Lot B, then Stock's claims relating to breaches and negligence with respect to Lot B cannot fall within the scope of Paragraph 15(b) of the Policy.

The trial court did not extensively discuss Counts III and IV. It said merely that Land Title had committed to insure only Lot A and, therefore, "Stock cannot recover on her claims . . . because [Land Title] had no duty to insure the title to Lot B."  Tr. Ct. Op., 4/22/13, at 14. That conclusion lost sight of the full scope of Stock's claim, which was that Land Title had undertaken to provide insurance and other services with respect to all of the land she was buying from the Pezzolas. The trial court's entry of summary judgment for Land Title on these counts therefore was error.

## Count I (Questions 1 to 7)

Most of the attention in the trial court and on appeal has focused on the first count in Stock's amended third-party complaint, which alleges breach of the Title Insurance Policy and Commitment. Based on the schedules attached to those documents, which contained metes-and-bounds descriptions only of Lot A, the trial court held that the Title Insurance Policy unambiguously covered only Lot A. Stock contends, however, that there are ambiguities in the property descriptions, particularly as a result of the

references in the schedules to "County Parcel Number 4-18-28." Stock argues that at the time the Policy was issued, Tax Parcel Number 4-18-28 included both Lots A and B. *See* Appellant's Brief at 13-16. Stock also notes that the Policy's definition of "land" includes land "described or referred to" in the schedule describing the insured parcel, and she contends that the reference to the Tax Parcel Number at least constitutes a "reference" to Lot B that should be sufficient to bring that lot within the Policy's coverage. *See id.* at 19.

As our Supreme Court explained in *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co*., 908 A.2d 888 (Pa. 2006):

> The interpretation of an insurance policy is a question of law that we will review *de novo*. Our primary goal in interpreting a policy, as with interpreting any contract, is to ascertain the parties' intentions as manifested by the policy's terms. "When the language of the policy is clear and unambiguous, we must give effect to that language." Alternatively, when a provision in the policy is ambiguous, "the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage."

908 A.2d at 897 (internal citations and brackets omitted). A contract is ambiguous if "it is fairly susceptible of different constructions and capable of being understood in more than one sense." *Chester Upland Sch. Dist. v. Edward J. Meloney, Inc.*, 901 A.2d 1055, 1060 (Pa. Super. 2006) (citation omitted). "This question is not to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one

reasonable interpretation when applied to a particular set of facts." ***Id.*** (citation omitted).

The trial court rejected Stock's ambiguity argument, holding that, as a matter of law, the reference to Parcel Number 4-18-28 did not include Lot B. ***See*** Trial Ct. Op., 4/22/13, at 14. The court based this holding on Section 10 of the Deeds and Conveyancing Law of 1909, 21 P.S. § 10.1, which was added in 1988 to implement the Uniform Parcel Identifier Law (UPIL).[14] Section 10(a) provides:

> In counties adopting a uniform parcel identifier system under statutory provisions on parcel identification, all conveyances, mortgages or releases or other instruments affecting real estate included in the system may be made by reference to the uniform parcel identifier of the real estate being conveyed, mortgaged, released or otherwise affected as indicated on the recorded county tax maps. The first conveyance, mortgage, release or other instrument affecting real estate recorded after the adoption of an ordinance under the statutory provisions on parcel identification shall contain the uniform parcel identifier assigned to the parcel or parcels affected by such instrument. Thereafter, ***the first conveyance after a change of size and description of real estate represented by a uniform parcel identifier shall contain, in addition to the uniform parcel identifier assigned to the parcel, or parcels affected by the instrument, either:***
>
> ***(1) A metes and bounds description based on a precise survey; or***

_____

[14] The UPIL, Act No. 1988-1, P.L. 1 (Jan. 15, 1988), 21 P.S. §§ 331-337, sets forth a system for identifying real estate parcels on tax maps and other records. At the time of its enactment, the Legislature made conforming amendments to other real estate statutes. It added Section 10 to the 1909 Deeds and Conveyancing Law by Act No. 1988-3, P.L. 6 (Jan. 15, 1988).

> **(2) A lot number and reference to a recorded subdivision plan which plan on its face shows metes and bounds prepared by a professional land surveyor** as required by the act of May 23, 1945 (P.L. 913, No. 367), known as the "Professional Engineers Registration Law. . . ."

21 P.S. § 10.1(a) (emphasis added).

The court held that the first conveyance after the merger of Lots A and B in Tax Parcel 4-18-28 was the 1999 sale from the Pezzolas to Stock, but that the deed for that conveyance "did not include either a metes and bounds description based on a precise survey of Lots A and B, or a lot number and reference to a recorded subdivision plan" in accordance with Section 10(a). Trial Ct. Op., 4/22/13, at 14.[15] Therefore, the trial court held, "any reference to 'Parcel Number 4-18-28,' including the reference contained in the Commitment, did not include Lot B, and . . . Lot A and Lot B were never actually conveyed together until the Deed of Confirmation from the Pezzolas to Stock was recorded [in 2008]. . . ." ***Id.***[16] Because the deed

---

[15] The deed refers to Lot No. 4 "on said Plan," but neither party has contended that this reference satisfies Section 10(a)(2), and the trial court therefore did not address that issue. As discussed in footnote 5, ***supra***, the parties have not identified what "said Plan" is or shown whether it is in the record.

[16] In response to this holding, Stock argues that the subdivision plan filed when the Borough transferred Lot B to the Pezzolas in 1994 merged Lot B into County Parcel 4-18-28 and satisfied the requirements of the UPIL. ***See*** Appellant's Brief at 16-17, Ex. C. However, this subdivision plan merely showed that Lot B had been severed from the rest of Parcel Number 4-18-29. ***See id.*** Moreover, the 1999 deed, which contains a property description and lot and parcel number references identical to what is in a 1991 deed

*(Footnote Continued Next Page)*

did not convey title to Lot B, and because the description of the property in the Title Policy and Commitment is identical to that in the deed, the trial court concluded that the Policy and Commitment did not cover Lot B. *See id.*

We do not disagree with the trial court's analysis — so far as it goes. The analysis makes plain that the deed from the Pezzolas to Stock did not convey Lot B, even though it referred to a tax parcel number that included both Lots A and B. Indeed, no party to this case argues otherwise; everyone agrees that the deed conveyed only Lot A. Because the description of the property in the Title Commitment and Title Policy was identical to that in the deed, it therefore stands to reason that this description also describes only Lot A.

But rejection of Stock's argument regarding the import of "Parcel Number 4-18-28" in the description of the property does not, as the trial court appears to have concluded, completely resolve the question of coverage under the Policy. We have long held that descriptions of property in an insurance policy must be construed with reference to the insured's reasonable expectations regarding the coverage being purchased.

---

*(Footnote Continued)*

(that is, a deed dating prior to the 1994 Lot B transaction), does not clearly refer to the 1994 subdivision plan, as required by the UPIL. *See* 21 P.S. § 10.1(a)(2).

Thus, for example, in **Presson v. Commonwealth Mut. Fire Ins. Co**., 77 A.2d 353 (Pa. 1951), a policy insured property "occupied as a Club situated E/S of U.S. Highway #61 on Part of U.S. Private Survey No. 1062 Twp. 24 Range 14, New Madrid County one mile South of Sikeston, Missouri, State of Missouri," but the property intended to be insured "was located not on Survey No. 1062 but on Survey No. 1032." 77 A.2d at 354. Our Supreme Court held that the insurance company was obligated to pay when property at the intended location was destroyed by fire. It explained: "The pertinent legal criterion is whether there is sufficient description, exclusive of the erroneous reference, to identify the building containing the property intended to be insured. If there is, then the error is an immaterial variance with no effect whatsoever upon the validity of the policy." **Id.** In reaching this result, the Court looked to precedents from New York:

> The applicable rule was well exemplified in **Curnen v. Law Union & Rock Insurance Co., Limited**, 159 App. Div. 493, 144 N.Y.S. 499, 500, where the insurance policy covered furniture and personal effects "contained in or on the building . . . situate northeast cor. of 2nd street, and Wolf's lane . . .", whereas the building was actually located on the northwest corner. The court there said, — "Such an inaccuracy raises a question of construction: Can the part plainly erroneous be rejected, and yet leave enough to designate the location with certainty? This rule of construction has frequently been resorted to in aid of clerical misdescriptions of the site of insured buildings or of buildings containing the property to be insured. The rule of rejecting such errors, where sufficient remains to show the place intended, has been applied where the building containing the subject-matter has been described by an inaccurate street number (**Westfield Cigar Co. v. Reliance Insurance Cos**., 165 Mass. 541, 43 N.E. 504); where a warehouse containing the insured goods was described from the

street number in the rear, instead of on the street where it fronted (***Edwards v. Fireman's Insurance Co***., 43 Misc. 354, 87 N.Y.S. 507); and where furniture insured was inadvertently written as on the southerly, instead of the northerly, side of a country road (***Le Gendre v. Scottish Union & Nat. Ins. Co***., 95 App. Div. 562, 88 N.Y.S. 1012). Also, as here, where a street corner was denoted by a wrong compass direction. ***Burr v. Broadway Insurance Co***., 16 N.Y. 267. This last case raised a further difficulty, as the insured did own two buildings quite similar on the northwest and at the southwest corners of the crossing streets. Yet by eliminating from the policy 'No. west,' enough was left to make certain the building to which the contract related."

***Id.*** at 355.

Similarly, and closer to the facts at issue here, in ***Litto v. Public Fire Ins. Co***., 167 A. 603 (Pa. Super. 1933), Litto purchased a fire insurance policy covering property in a two-story house at 324 W. 17th Street in Erie. It turned out that there were two houses at that address; the one in the front had two stories, while the one in the rear had only one and one-half stories. Litto's house was the one in the rear, and the trial court therefore entered judgment for the insurer because the policy covered a two-story house. On appeal, we reversed, stating:

An insurance policy does not require a technical description as is ordinarily employed in the conveyance of real estate. Thus it was held that, "where through an error of a broker, a building, the contents of which were insured, is described as located at a certain corner, when it is on another corner, and there is no other building on any of the four corners, the insurance is not avoided, the theory being that the rule of rejection of the erroneous part of the description in case of inaccuracies applies if there is enough to leave to identify the property." It is suggested that that same rule applies here as the words "two stories" do not invariably have the same meaning. Any building having two floors in it may be called a two-story building, and

- 21 -

the designation of the upper story as "a half story" is a description of that kind of a story which, notwithstanding, is still a story.

We then have these facts that the household furniture was in a house occupied by the insured, that it was at 324 West 17th Street, and that in one sense of the word the furniture was in a two-story building and that this answered the description in the policy.

167 A. at 603-04; *see also Shanahan v. Agricultural Ins. Co.*, 6 Pa. Super. 65, 70 (1897) (where insured applied for fire insurance on two stables, but the insurance agent mistakenly wrote "building" instead of "buildings" in the policy, insurer could not deny coverage on ground that building that burned down was not the one that was insured).

Our cases in this area deal mostly with fire and casualty policies, but we are aware of no ground upon which the result should differ if, as here, the policy insures title. "Generally speaking, a title insurance policy is subject to the same rules of construction that govern other insurance policies." *Rood v. Commonwealth Land Title Ins. Co*., 936 A.2d 488, 491 (Pa. Super. 2007), *appeal denied*, 960 A.2d 841 (Pa. 2008).

The results in these cases have been justified on various grounds. The preceding examples construe the policies to effectuate the intent of the parties without regard to technical language that may obstruct that intent. At other times, we have based a similar result on principles of estoppel, noting that insurance companies write policies based on information from their agents and are estopped from relying on the agents' mistakes as a

- 22 -

means of denying insureds coverage that conforms to their reasonable expectations. As we stated in *Litto*:

> [A]n insurance company is estopped to set up the fact that the location of the property covered by an insurance policy was not properly stated where it appears that the error was due entirely to the mistake of the agent. Where the agreement in a policy is to insure certain property of a party such as the house in which he and his family reside, a barn on his farm, or a warehouse for the storage of produce, or as the case may be, personal property, the court will look to the real contract of the parties which was to insure the property of the policy holder.

167 A. at 604. We stated our holding in *Litto* regarding estoppel as an alternative to construing the description of the property in the policy to cover the house that caught fire. *See id.*[17]

Our courts have followed similar reasoning in later cases. For example, in *Tonokovic v. State Farm Mut. Auto. Ins. Co*., 521 A.2d 920, 925 (Pa. 1987), our Supreme Court applied equitable estoppel principles to uphold an insured's reasonable expectations regarding the purchase of

_____

[17] We concluded our opinion in *Litto* as follows:

> In the present case, the mistake of the agent, who was acting for the company and who countersigned the policy, was, in law, that of the company, and it does not lie in its mouth to claim that it has escaped liability by reason of the error of its agent. No person or company should profit by his or its own mistake, and if the location of personal property is misdescribed by insurer's agent when, as in this case, the proper information has been given to him, the insured, without asking for reformation of the policy, may, in an action, recover for his loss, if he can convince the jury that such is the case.

167 A. at 604.

disability insurance. Tonokovic applied for such insurance so that he would be able to make mortgage payments if he was injured, regardless of his eligibility for workers' compensation benefits. He was later injured while working, and received workers' compensation benefits. His insurance claim was denied based on a provision in the policy that excluded coverage for injuries for which workers' compensation benefits were available. Tonokovic sued on the policy and obtained a jury verdict in his favor, which the Supreme Court ultimately upheld. The Court explained that "where one applies for a specific type of coverage and the insurer unilaterally limits that coverage, resulting in a policy quite different from what the insured requested," the insured should not be deprived of his reasonable expectations without notice:

> Courts should be concerned with assuring that the insurance purchasing public's reasonable expectations are fulfilled. Thus, regardless of the ambiguity, or lack thereof, inherent in a given set of insurance documents (whether they be applications, conditional receipts, riders, policies, or whatever), the public has a right to expect that they will receive something of comparable value in return for the premium paid. . . .
>
> Courts must examine the dynamics of the insurance transaction to ascertain what are the reasonable expectations of the consumer.

*Id.* at 925-26 (quoting **Collister v. Nationwide Life Ins. Co**., 388 A.2d 1346, 1353-54 (Pa. 1978), **cert denied**, 439 U.S. 1089 (1979)).

Similarly, this Court looked to an insured's reasonable expectations in **Pressley v. Travelers Prop. Cas. Corp**., 817 A.2d 1131 (Pa. Super. 2003).

Pressley asked her insurance agent to add her mother, Brown, to her Travelers automobile insurance policy, and to provide Brown with the same coverage Presley had. Despite his promise to do so, the agent never added Brown to the policy. When Brown subsequently died in a car accident, Travelers denied coverage, arguing that the express language of the policy limited coverage to family members who lived with Pressley. (Brown did not.) After a non-jury trial, the trial court entered judgment in favor of Pressley, and we affirmed. Relying on **Tonokovic**, we reasoned that Pressley had a reasonable expectation that Brown would be covered, based on her request for coverage and the agent's failure to inform her that she did not receive what she had requested. **Pressley**, 817 A.2d at 1141.

Here, Stock contends that, "even if the Policy could be read to be limited to the metes and bounds description, [Land Title] is estopped from denying coverage" because the erroneous description in the Policy resulted from Land Title's failure to conduct a proper title search and to provide a policy covering all of 4 Mill Street and the entire premises covered by her Agreement of Sale. Appellant's Brief at 21. There is no evidence in the record to suggest that the alleged error in the Policy's coverage was caused by Stock herself, and we note that Land Title's brief does not refute or in any way address Stock's argument on this issue. The trial court did not address this argument in either of its opinions.

We therefore conclude that even though the trial court was correct that Stock was not entitled to summary judgment on Count I, the court erred in entering summary judgment on that count in favor of Land Title. At the least, there remain material issues of fact relating to Stock's estoppel argument that must be considered on a remand. In that remand, the trial court also may consider any other issues regarding coverage and Count I that have not yet been resolved.[18]

**Count II (Questions 8 to 10)**

Stock argues that the trial court erred in granting summary judgment in favor of Land Title with regard to her claim of bad faith. She contends that she was entitled to summary judgment on this claim.

The Pennsylvania bad faith statute provides:

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S. § 8371. While the statute does not define bad faith, this Court has explained that bad faith "encompasses a wide variety of objectionable

---

[18] These include any defenses Land Title may continue to assert under exclusions in the Policy. The trial court did not address those issues, and we decline to do so in the first instance.

conduct," ***Condio v. Erie Ins. Exch.***, 899 A.2d 1136, 1142 (Pa. Super.),

***appeal denied***, 912 A.2d 838 (Pa. 2006), and that —

> For example, bad faith exists where the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim. Bad faith conduct also includes lack of good faith investigation into facts, and failure to communicate with the claimant.

***Id.*** (citations and quotation marks omitted).

In granting summary judgment in favor of Land Title, the trial court reasoned that Land Title "clearly had a reasonable basis for denying Stock benefits, because . . . [Land Title] had no duty to defend Stock for title discrepancies related to Lot B." Trial Ct. Op. 5/26/16, at 13. As we have determined, however, there remain material issues of fact with regard to the coverage issue.[19] Therefore, the trial court's reasoning does not adequately dispose of Stock's bad faith claim. In addition, and more fundamentally, we have observed that bad faith claims "are distinct from the underlying contractual insurance claims . . . . Rather, § 8371 provides an independent cause of action to an insured that is not [dependent] upon success on the merits, or trial at all, of the contract claim." ***Nealy v. State Farm Mut. Auto. Ins. Co.***, 695 A.2d 790, 792-93 (Pa. Super. 1997), ***appeal denied***, 717 A.2d 1028 (Pa. 1998). The trial court's reasoning about the scope of

_____

[19] Because material issues of disputed fact remain, the trial court did not err in denying Stock's motion for summary judgment on Count II.

coverage under the Policy therefore is not necessarily determinative on the bad faith issue.

Moreover, the trial court misperceived the scope of Stock's bad faith claim. Stock did not limit her claim to Land Title's denial of coverage and refusal to provide Policy benefits, but also complained regarding "the claims handling conduct which occurred over a six month period before finally advising Stock that [Land Title] was denying coverage." Appellant's Brief at 30; *see also* Second Am. Third-Party Compl. ¶¶ 44-47. Stock also alleges that Land Title violated the bad faith statute by advancing "the defenses that Stock failed to cooperate with [Land Title] as required by the Policy and/or that it was the actions/inactions of Stock and/or her counsel which were the proximate cause of Stock's losses." Appellant's Brief at 37; *see also* Stock's Motion for Summ. J. at ¶¶ 63-64. The trial court did not address these aspects of Stock's bad faith claim, and these issues remain for resolution on remand.

We also remand for the trial court to consider Stock's claim that Land Title breached its duty to defend Stock under the Title Policy when Stock was sued by Michael.[20] The Supreme Court has explained that the duty to defend is distinct from the duty to provide coverage:

_____

[20] We note that Stock appears to argue about Land Title's duty to defend both in connection with her bad faith claim and also as a freestanding claim

*(Footnote Continued Next Page)*

An insurer's duty to defend is broader than its duty to indemnify. It is a distinct obligation, separate and apart from the insurer's duty to provide coverage. An insurer is obligated to defend its insured if the factual allegations of the complaint on its face encompass an injury that is actually or potentially within the scope of the policy. As long as the complaint "might or might not" fall within the policy's coverage, the insurance company is obliged to defend. Accordingly, it is the potential, rather than the certainty, of a claim falling within the insurance policy that triggers the insurer's duty to defend.

***Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.***, 2 A.3d 526, 540-41 (Pa. 2010) (internal citations omitted). The trial court did not separately analyze Stock's claim that Land Title breached its duty to defend her under the Policy, other than to hold that there was no policy coverage because the Policy did not apply to title issues regarding Lot B. **See** Trial Ct. Op., 4/22/13, at 14. Because we have vacated the trial court's entry of summary judgment on that Policy issue, the trial court must further examine this issue.

In sum, we vacate the trial court's award of summary judgment in favor of Land Title with respect to Stock's bad faith claim. We instruct the trial court, on remand, to consider all aspects of Stock's claim under the proper standard.

* * *

*(Footnote Continued)* —————

that Land Title's refusal to defend breached the Title Policy. Both aspects of this issue should be considered by the trial court on remand.

Judgment vacated. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/11/2017